UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ANDRE J. TWITTY,                        :
                                        :
        Plaintiff,                      :
                                        :
        v.                              :        CASE NO. 3:04CV410(DFM)
                                        :
JOHN ASHCROFT, et al.,                  :
                                        :
        Defendants.                     :


RULING ON PLAINTIFF'S MOTION FOR A NEW TRIAL

The plaintiff, Andre Twitty, a federal inmate, brought suit pursuant to 42 U.S.C. § 1983 against Scott Salius, a Connecticut Department of Correction employee, alleging excessive force in violation of the Eighth Amendment to the United States Constitution.[1]  Following trial, the jury returned a verdict in favor of the defendant.  Pending before the court is the plaintiff's motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a).  (Doc. #210.)  The plaintiff argues that he is entitled to a new trial because: (1) the verdict was against the weight of the evidence and (2) the court failed to give the jury certain requested instructions.  For the reasons that follow, the plaintiff's motion is denied.

I.   Legal Standard

Fed. R. Civ. P. 59(a) provides: "The court may, on motion,

_____

[1]The plaintiff initially named other defendants but Scott Salius was the only defendant remaining at the time of trial.  See doc. #58.

grant a new trial on all or some of the issues – and to any party
. . . after a jury trial, for any reason for which a new trial has
heretofore been granted in an action at law in federal court." The
authority to grant a new trial under Rule 59 rests within the
discretion of the trial court. Allied Chemical Corp. v. Daiflon,
Inc., 449 U.S. 33, 36 (1980). See Haber v. County of Nassau, 557
F.2d 322, 325 (2d Cir. 1977) ("The trial judge has a large
discretion in ordering a new trial.") "Unlike judgment as a matter
of law, a new trial may be granted even if there is substantial
evidence supporting the jury's verdict. Moreover, a trial judge is
free to weigh the evidence himself, and need not view it in the
light most favorable to the verdict winner." DLC Mgmt. Corp. v.
Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998). "That being
said, for a district court to order a new trial under Rule 59(a),
it must conclude that the jury has reached a seriously erroneous
result or . . . the verdict is a miscarriage of justice, i.e., it
must view the jury's verdict as against the weight of the
evidence." Manley v. AmBase Corp., 337 F.3d 237, 245 (2d Cir.
2003). "A court considering a Rule 59 motion for a new trial . .
. should only grant such a motion when the jury's verdict is
'egregious.'. . . . Accordingly, a court should rarely disturb a
jury's evaluation of a witness's credibility." DLC Mgmt. Corp.,
163 F.3d at 134.

"An erroneous instruction, unless harmless, requires a new

trial." Anderson v. Branen, 17 F.3d 552, 556 (2d Cir. 1994). A party is entitled to relief under Rule 59 "only if [he] can show that in viewing the charge given as a whole, [he was] prejudiced by the error." Id. "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." Id.

## II. Background

This action arises from the plaintiff's intake at the Northern Correctional Institution ("Northern"), a maximum security facility operated by the Connecticut Department of Correction ("DOC") in Somers, Connecticut. On January 14, 2004, the plaintiff was transferred to Northern from the United States Penitentiary in Marion, Illinois, a maximum security facility operated by the Federal Bureau of Prisons. His transfer to Connecticut was pursuant to an interstate compact agreement. (Tr. 5/6/10 at 60.)

The defendant, a supervisor, was in charge of the plaintiff's intake. The defendant has been employed by the DOC for almost twenty years and at the time of the plaintiff's intake, was a lieutenant. (Tr. 5/6/10 at 46, 52.) The defendant testified that before the plaintiff arrived at Northern, he learned that the plaintiff "had been problematic during the transfer from Walker over to Northern." (Tr. 5/6/10 at 64.) The defendant was present during the plaintiff's intake and supervised two other corrections officers, Anthony Trombly and Stephen Rhodes, who escorted the

plaintiff to his housing unit.  The plaintiff's intake - from the time he got out of the van until he was secured in his cell - was videotaped by DOC staff.  (Tr. 5/6/10 at 66.)  The videotape was introduced as a joint exhibit.

An initial step in the plaintiff's processing was his identification on camera.  DOC staff attempted introduce the plaintiff by having him face the camera while an officer said the plaintiff's name and his CT DOC inmate number.  Despite being instructed by staff to remain silent, the plaintiff insisted that he was a federal prisoner.  He repeatedly interrupted the corrections officer by stating his federal inmate number. (Tr. 5/5/10 at 155, 160.)  The defendant saw the plaintiff's behavior as confrontational. (Tr. 5/6/10 at 68.)  The defendant instructed the plaintiff to abide by the rules and cautioned him that staff would use force if necessary to gain his compliance.

During his processing, the plaintiff made various comments to the defendant and his staff.  He said he had "eight more years to go." (Tr. 5/5/10 at 162.)  He also told the officers: "These are state boys. They don't mean shit to me." (Tr. 5/6/10 at 70.)  At trial, the plaintiff testified he meant to convey that he is a federal prisoner.  The defendant construed the plaintiff's comment to mean that the plaintiff "ha[d] no respect for [Northern's] authority." (Tr. 5/6/10 at 70.)

The DOC staff escorted the plaintiff to a room to be weighed.

4

The video shows some scuffling after the plaintiff stepped off the scale. According to the plaintiff, the corrections officers pulled him off the scale and pushed him against a wall. (Tr. 5/5/10 at 134.) They twisted his arms and fingers, causing him pain. (Id.) The defendant testified that as the plaintiff stepped off the scale, he pulled away from the escort staff and as a result, the officers secured him to the wall. (Tr. 5/6/10 at 72.) The video reveals that while he was secured against the wall, the defendant repeatedly asked the plaintiff if he wanted to be seen by medical staff. Despite the plaintiff's claims of injury, he declined. (Tr. 5/6/10 at 72.)

The defendant then instructed corrections officers Trombly and Rhodes to escort the plaintiff to his cell using a "reverse escort technique." (Tr. 5/6/10 at 74.) In this technique, an inmate is placed in restraints and faced backward, rather than forward. One corrections officer holds each of the inmate's arms. (Tr. 5/6/10 at 57.) According to the defendant, DOC staff use this escort technique when an inmate is not compliant and is showing "either passive resistance or some form of active resistance." (Tr. 5/6/10 at 58.) The defendant ordered the reverse escort technique as a result of the plaintiff's comments and his pulling away from staff. (Tr. 5/6/10 at 74-75.) Officers Trombly and Rhodes each took one of the plaintiff's arms and walked him backwards down the hall. (Tr. 5/5/10 at 138.) The defendant walked behind them and

supervised the escort. During the escort, the plaintiff repeatedly said that he was "not resisting." At one point, the defendant responded "Congratulations, you're not resisting." (Tr. 5/6/10 at 40.)

The plaintiff testified that the leg shackles hurt his ankles. (Tr. 5/5/10 at 139.) He said that during the escort, the officers went too fast for him to keep up and that as a result, he was dragged. (Tr. 5/5/10 at 139, 141, 148.) The plaintiff claimed that the officers deliberately let him fall to the floor and that when he was on the floor, Trombly struck him. (Tr. 5/5/10 at 143-44, 146, 176.)

The defendant contended that the plaintiff fell because he was not moving his feet and let himself "go limp." (Tr. 5/6/10 at 76.) Trombly and Rhodes helped the plaintiff up from the floor, then resumed using the reverse escort technique and escorted the plaintiff to his cell. (Tr. 5/6/10 at 78.) The defendant and Trombly both denied that Trombly (or anyone) punched or struck the plaintiff. (Tr. 5/6/10 at 39, 77.) The video shows the plaintiff's fall but does not show anyone strike him.

As they approached the plaintiff's cell, the defendant told the plaintiff that he would not be placed in in-cell restraints unless he resisted. (Tr. 5/6/10 at 80.) The defendant called medical personnel because he noticed abrasions on the plaintiff's ankles from the restraints and also because it was customary to do

so whenever staff used force. (Tr. 5/6/10 at 46.) DOC staff took photographs of the plaintiff's ankles and face once they reached the cell. (Tr. 5/6/10 at 82.) The photographs were introduced as exhibits.

The plaintiff received two disciplinary reports for his conduct during his intake -- one for "interfering with safety and security" and one for "threats." (Tr. 5/6/10 at 83.) He was found guilty on both charges. Id.

The plaintiff testified that after his intake, he submitted two or three written requests for medical attention every week for about a year. According to him, the requests were ignored and he was not seen by medical staff for seventeen months. (Tr. 5/5/10 at 194, 197.) He further testified that in addition to his written requests, he made verbal requests to medical staff as they made their rounds. (Tr. 5/5/10 at 197.) On cross-examination, the plaintiff did not dispute that his medical file, which was introduced into evidence, was devoid of any request for medical attention. (Tr. 5/5/10 at 195.) The defendant testified that medical personnel tour the facility twice per shift. (Tr. 5/6/10 at 84.)

The defense called Captain Barberi, a training captain for the DOC, who testified that he teaches various escort techniques. (Tr. 5/6/10 at 106.) According to Barberi, the reverse escort technique is appropriate when an inmate has demonstrated passive or active

resistance.  (Tr. 5/6/10 at 108-09.)

After considering the evidence, the jury found that the plaintiff did not prove by a preponderance of the evidence that the defendant used excessive force.

III. <u>Discussion</u>

A.   <u>Against the Weight of the Evidence</u>

The plaintiff first argues that the court should grant a new trial because the jury verdict was against the weight of the evidence.  The plaintiff contends that "the manner in which the reverse escort technique was used constituted excessive force." (Doc. #210, Pl's Mem. at 4.)  Specifically, the plaintiff claims that the defendant used the reverse escort technique "to inflict pain" on him, the officers walked too fast for him to keep up and as a result, he was pulled or dragged down the hall and he was struck while on the floor.  (<u>Id.</u> at 6.)

The court disagrees that the verdict was contrary to the weight of the evidence.  The plaintiff's excessive force claim depended on the jury believing the plaintiff's claim that the force used was applied "maliciously and sadistically to cause harm" rather than, as the defendant maintained, in a good-faith effort to maintain or restore discipline.  <u>Wilkins v. Gaddy</u>, 559 U.S. ----, ----, 130 S.Ct. 1175, 1178 (2010).  As the plaintiff acknowledges, to resolve this issue, the jury had to assess the parties' credibility.  (Tr. 5/6/10 at 126.)  In making these credibility

determinations, the jury had before it not only the testimony of the witnesses but a videotape of the entire incident. Although the plaintiff contended, inter alia, that the staff dragged and assaulted him, the video was not nearly so conclusive and the jury was certainly entitled to reject the plaintiff's testimony. That the jury chose not to believe the plaintiff's version of the facts was hardly unreasonable given the evidence presented by both sides, which included credible evidence contradicting the plaintiff's testimony. Having carefully reviewed the plaintiff's arguments and all of the evidence, the court is far from "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." United States v. Landau, 155 F.3d 93, 104 (2d Cir. 1998). See Metromedia Co. v. Fugazy, 983 F.2d 350, 363 (2d Cir. 1992) (where "the resolution of the issues [depends] on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial"); Rosa v. City of Fort Myers, No. 2:05cv481-FtM-29SPC, 2008 WL 398975, at *2 (M.D. Fla. Feb. 12, 2008)(court denied plaintiff's motion for a new trial in an excessive force case where "the video did not conclusively establish excessive force, and the testimony was disputed as to who said and did what during the event"), aff'd, 297 Fed. Appx. 830 (11th Cir. 2008).

   B.   Claimed Errors Regarding the Jury Charge

   The plaintiff's remaining claims concern the court's jury

charge.

      1.   <u>Adverse Inference</u>

The plaintiff argues that the court erred by failing to give the jury an adverse inference charge regarding the videotape. The plaintiff claims that the denial of his request for an adverse inference instruction "substantially affected [his] ability to prevail on his claim and hindered [his] ability to succeed." (Doc. #210, Pl's Mem at 10.)

The following facts are relevant to the plaintiff's argument. The original videotape of the plaintiff's intake was maintained at the prison facility, Northern. Over the years in which this litigation has been pending, many copies were made.[2] Some copies were made from the original videotape, others were made from copies of the videotape. Prior to trial, plaintiff's counsel (who recently had been appointed) complained to defense counsel that his copies were of inferior quality and he asked to view the original tape. He and defense counsel together viewed the original tape at Northern. The plaintiff took the position that the original was of higher quality than his copies. Counsel subsequently agreed to permit a third party vendor to make a DVD from the original VHS tape for use at the trial. On April 7, 2010, defense counsel brought the original VHS tape from Northern to the vendor. At that time, it was discovered that the original was damaged -- it had

_____

[2]One copy was submitted with the defendants' motion for summary judgment in September 2007.

been taped over. The next day, the plaintiff filed a motion for leave to conduct discovery regarding spoliation of evidence. (Doc. #147.) The court heard oral argument and granted the plaintiff's motion. (Doc. #143; tr. 5/13/10 at 57-61.)

Discovery revealed that after plaintiff and defense counsel viewed the original tape, defense counsel requested that a corrections officer make copies. This officer delegated the request to another officer. Copies were made and provided to defense counsel. Because the tape included the intakes of other inmates as well as the plaintiff's, defense counsel requested that copies be made only of the segment of the tape with the plaintiff's intake. He was told that the footage could not be isolated. On March 31, 2010, before defense counsel was to pick up the original to take it to the vendor, a corrections officer, Officer Sokolowski, attempted to make a copy of the original tape for the prison's file. In his deposition, Sokolowski testified that he believes that he altered the original tape at that time when he incorrectly hit both the "record" and "copy" buttons on the machine rather than just the "copy" button. (Doc. #185, Ex. A, Sokolowski Dep. at 67.) The officer had not previously used the VHS machine at Northern to make a copy of a VHS tape and was unaware of how to do it correctly. (Id. at 62.)

After conducting discovery, the plaintiff filed a motion for an adverse inference based on spoliation. (Doc. #184.) The

plaintiff sought an instruction telling the jury that the jury may
infer that the original tape was adverse to or inconsistent with
the defendant's position.  Specifically, the plaintiff requested
that the jury be instructed that

> The parties have agreed that as a result of conduct of
> the Defendant or his agents, the original videotape of
> Plaintiff's intake into Northern has been destroyed. As
> a result of that destruction, you may infer that the
> original videotape was adverse to or inconsistent with
> [Defendant] Salius's position in this case.

(Doc. #184.)

In support of his motion, the plaintiff maintained that there
were "differences in both sound, color and clarity between the
original and the copies provided to the Plaintiff" and provided an
affidavit to that effect. (Doc. #152 at 3; Tr. 5/5/10 at 54[3], doc.
#152, White Aff.)  Plaintiff's counsel offered to provide an <u>ex
parte</u> submission detailing the perceived differences.  (Doc. #152
at 3 fn 3, Tr. 5/5/10 at 82.)  He contended that to state them in
open court would compromise his trial strategy.  (Doc. #152 at 3
fn. 4.)

Spoliation is "the destruction or significant alteration of
evidence or the failure to preserve the property for another's use
as evidence in pending or reasonably foreseeable litigation." <u>West
v. Goodyear Tire & Rubber Co.</u>, 67 F.3d 776, 779 (2d Cir. 1998).

---

[3]During oral argument, plaintiff's counsel said that he could
"hear things much clearer on the original than [he could] hear on
the copy. There was also with respect to people's mannerisms and
faces, your Honor, it was crystal clear on the original and it was
not crystal clear on the tape." (Tr. 5/5/10 at 54.)

"[A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense." Residential Funding Corp. v. DeGeorge Financial Corp., et al., 306 F.3d 99, 107 (2d Cir. 2002).

After hearing oral argument on the plaintiff's motion, the court determined that the plaintiff failed to satisfy the standards for an adverse inference instruction and denied the motion. (Doc. #192, Tr. 5/5/10 at 76-91.) Applying the legal standard enunciated in Residential Funding, the court concluded, inter alia, that (1) the defendant himself had no role in the preservation or damage to the original tape; (2) the tape "was damaged as a result of negligence; an error caused by improper use of the equipment at the prison resulted in the damage to the original tape"; and (3) there are satisfactory copies available and that the "actual differences between the copies are limited to nuances: Tracking, color and audio quality." (Tr. 5/5/10 at 88-90.) The court noted that "it is not as if all evidence has been destroyed or even that the jury is left with a useless copy. Remaining copies do show the incident at issue." (Tr. 5/5/10 at 91.)

The plaintiff argues the court erred in its conclusions. He

maintains here, as he did initially, that the DOC's action should be imputed to the defendant and that the conduct was willful, if not grossly negligent, because the corrections officer was unqualified to make a copy of the tape.

The court did not err in declining to give the requested adverse inference instruction. It is undisputed that a copy of the videotape was provided to the plaintiff and used at trial. The copy introduced at trial was unedited and reflected the entirety of the plaintiff's intake. As the court previously found, "the requested penalty [of an adverse inference charge] would be overly harsh for what has occurred here." (Tr. 5/5/10 at 91.)

2.  Prolonged Conduct

The plaintiff next argues that the court erred by failing to give the jury an instruction that conduct that might begin as appropriate can become cruel and unusual if prolonged beyond the point of necessity. The plaintiff requested the following instruction

> In other words, even if the conduct was proper at its inception, it could become cruel and unusual if Mr. Twitty was subjected to such conduct for a longer period of time than was necessary to deal with any safety concern.

Although the court did not adopt in whole the plaintiff's proposed instruction, the court included language telling the jury to consider whether the safety concerns necessitating the use of force had abated and the need for any use of force had ended.

14

Specifically, in instructing as to the defendant's state of mind, the court instructed the jury to consider "whether the need for any use of force had ended." The court charged the jury in relevant part that

> The Plaintiff must prove that the Defendant had a wanton state of mind. Wantonness turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically to cause harm. It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Eighth Amendment.
>     In determining whether the use of force was wanton, you may consider the need for application of force, whether the need for any use of force had ended, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials and any efforts made to temper the severity of the forceful response. Corrections officers must balance the need to maintain or restore discipline through force against the risk of injury to inmates. In determining whether the Defendant acted wantonly, you must not base your decision upon the 20/20 vision of hindsight. You must put yourselves in the place of the Defendant during the very moment when the events were occurring and judge his actions as of that time and under those circumstances. The infliction of pain in the course of a prison security measure does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable and hence unnecessary in the strict sense.[4]

(Tr. 5/7/10 at 74-75.)

"A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury

---

[4]The court's charge regarding excessive force was based on Second Circuit and Supreme Court authority including <u>Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992), <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989), <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986), <u>Wright v. Goord</u>, 554 F.3d 255, 268 (2d Cir. 2009) and <u>Romano v. Howarth</u>, 998 F.2f 101, 105 (2d Cir. 1993).

on the law." <u>LNC Investments, Inc. v. First Fidelity Bank, N.A.</u>, 173 F.3d 454, 460 (2d Cir. 1999). The jury instructions given in this case did not provide "a misleading impression or inadequate understanding of the law." <u>BAII Banking Corp. v. UPG, Inc.</u>, 985 F.2d 685, 696 (2d Cir. 1993).

   3.   <u>Supervisor Liability</u>

The plaintiff next claims that the court erred in its jury instruction regarding supervisor liability. Based on <u>Provost v. City of Newburg</u>, 262 F.3d 146, 155 (2d Cir. 2001), the court instructed the jury in relevant part:

> In order to find the Defendant liable in this case, you must find that he directly participated in the violation of the Plaintiff's constitutionally protected rights. To find that the Defendant was liable under this theory, you must find that he intentionally participated in the conduct constituting a violation of the Plaintiff's rights and that he knew of the facts rendering the conduct illegal. Under the law, a supervisor can be held liable if he had knowledge of the illegality of the conduct and participated in bringing about a violation of the Plaintiff's rights, even if he does so in a manner that might be said to be "indirect," such as ordering or helping others to do the unlawful acts rather than doing them himself.

(Tr. 5/7/10 at 78-79.)

The plaintiff argues that the charge confused the jury because the court insufficiently explained that indirect conduct could constitute direct participation and hence, liability. The plaintiff claims that the instruction erroneously led the jury to believe that they could not hold the defendant liable if he did not physically inflict the force on the plaintiff. (Doc. #210, Pl's

16

Mem. at 12.)  The court is not persuaded.  The jury charge was drawn nearly verbatim from Provost and instructed that liability may be found against "a person who, with knowledge of the illegality, participates in bringing about a violation of the victim's rights but does so in a manner that might be said to be 'indirect'. . . ."  Id.  The charge as a whole adequately instructed the jury as to the correct legal standard.

4.  Training in the Reverse Escort Technique

The plaintiff's final claim is that the court erred in failing to give the plaintiff's requested charge regarding the defendant's training in the reverse escort technique.  (Doc. #210, Pl's Mem. at 13.)  The plaintiff requested that the court provide the following instruction:

> You have heard evidence regarding training that was provided to the Defendant, namely, as to the use of the reverse wrist lock escort technique.  The mere fact that the Defendant was trained to use a technique does not automatically mean that his actions are constitutional and/or exempt him from liability.  Rather, in determining whether Mr. Twitty's constitutional rights have been violated, you must consider the instructions I gave to you with respect to prisoner excessive force claim.

(Doc. #149, Ex. 3 at 2.)  The plaintiff based the proposed instruction on California Attorneys for Criminal Justice v. Butts, 195 F.3d 1039, 1049 (9th Cir. 1999) and Thaddeus-X v. Blatter, 175 F.3d 378, 393 (6th Cir. 1999).[5]  The plaintiff argues that the

_____

[5]In California Attorneys for Criminal Justice v. Butts, 195 F.3d 1039 (9th Cir. 1999), the plaintiffs alleged that the defendants deliberately questioned suspects in violation of Miranda.  The defendants argued that they were entitled to summary

instruction would have clarified for the jury that "the mere fact that the defendant was trained in the reverse escort technique does not mean his actions were constitutional." (Doc. #210, Pl's Mem. at 13.)

The court did not err in not giving the plaintiff's requested instruction. The defendant did not suggest, much less argue, that the use of the reverse escort technique as to the plaintiff was constitutional because corrections staff had received training on the technique. The court's instructions as a whole adequately informed the jury of the relevant considerations in determining whether the defendant's use of force was wanton. See tr. 5/7/10 at 70-76.

IV. Conclusion

For these reasons, the plaintiff's motion for a new trial (doc. #210) is denied.

SO ORDERED at Hartford, Connecticut this 6th day of January, 2011.

_____/s/_____
Donna F. Martinez
United States Magistrate Judge

_____

judgment on the grounds of qualified immunity because they relied on training and training materials. The Court of Appeals concluded that the fact that certain police departments "may have trained their police to violate the rights of individuals does not provide any defense for these officers." Id. at 1049. The case of Thaddeus-X v. Blatter, 175 F.3d 378 (6th Cir. 1999), a prisoner civil rights claim, concerned respondeat superior, which does not apply here.